Whitaker, Judge,
delivered the opinion of the court:
Plaintiffs sue for just compensation alleging that the defendant has taken certain mineral rights which plaintiffs owned in 2875.24 acres of land located within the confines of the Wolf Creek Reservoir on the Cumberland River in Rus *372 sell and Clinton Counties, Kentucky. The Government admitted that by reason of the construction of the Wolf Creek Dam, minerals cannot be removed from the land. It defended solely on the ground that plaintiffs did not have title to the minerals in lands claimed.
At the trial of this case, it was agreed that the plaintiffs were the successors in interest of one W. A. Hoskins, who in 1864 and 1865 had allegedly purchased the mineral rights in land owned by eleven different individuals in the area in question. Each of the eleven deeds to Hoskins did not specifically describe the location of the property interest conveyed, but rather referred to previous deeds of record for a complete description. However, in 1864 the Clinton County courthouse burned, and these deeds, which were referred to, were for the most part destroyed.
It became necessary, therefore, for plaintiffs to identify this property in some other manner. In certain instances, plaintiffs were able to identify the grantors’ conveyed interests by reference to original patents issued to them by the Commonwealth of Kentucky which were also referred to in the deeds to Hoskins. This was the case with regard to all or part of the tracts designated H-l, H-4, and I-I-ll on the map prepared by one Gibson, county surveyor, filed as plaintiffs’ exhibit 7. Neither the plaintiffs nor the defendant dispute the evidence or the findings with regard to these tracts and, therefore, we affirm these findings without further comment. The acreage in these three tracts totals 420 acres.
Plaintiffs also used documentary evidence to prove the location of tracts H-5 and H-10. With regard to tract H-5, the plaintiffs introduced in evidence a deed executed, subsequent to the conveyance of the mineral interest to Hoskins. This deed purportedly revested Hoskins’ grantor with title to part of this tract because the original deed had been destroyed in the courthouse fire. Since the conveyance .to Hoskins mentioned the original deed, we believe this evidence is sufficient to prove the location of that part of tract H-5 which the subsequent deed to the mineral interests describes. In proof of the location of tract H-10, plaintiffs were able to produce the deed referred to in the conveyance to Ploskins. However, this deed did not sufficiently describe the property, *373 but a patent which was also mentioned in the conveyance conclusively proved the location of part of this tract. The remaining part of the tract was located by the fact that when the fee was sold in later years, the grantor excepted the minerals that had previously been conveyed to Hoskins. We hold this evidence was sufficient to prove the location of tract H-10. The acreage in these two tracts totals 345 acres.
With regard to tracts H-6 and H-7, the trial commissioner found that plaintiffs did not present sufficient evidence to prove their location. Since plaintiffs do not except to this conclusion, we adopt it as our findings as to these tracts.
In attempting to prove the location of tracts H-2, H-3, H-8, and H-9, the plaintiffs introduced some documentary evidence, but, standing alone, this evidence was not sufficient to prove the location of these tracts. To support their contention, the plaintiffs also produced certain witnesses, who were members of the community and familiar with the lands in question. These witnesses, chiefly one Gibson who was a local surveyor, gave testimony to the effect that as a matter of general reputation in the community the tracts in question were the lands which had been owned by Hoskins’ grantors and were owned by them at the time of the conveyance.
Of course, this parole testimony was hearsay, since most of the witnesses did not know these facts personally, but the plaintiffs say that this evidence is admissible as an exception to the hearsay rule. We agree with the plaintiffs. Community reputation about facts which are no longer available to individuals or susceptible of other proof has long been admissible to show the location of ancient boundaries. E.g. Boardman v. Reed, 6 Pet. (U.S.) 328; Hail v. Haynes, 312 Ky. 357, 227 S.W. 2d 918. The reason for this rule is not only caused by the perishable nature of boundary markers, but also because general reputation about facts of community interests are generally trustworthy. It is unlikely that a falsehood could become generally accepted in a community as the truth. The prolonged and constant exposure of these facts to observation and discussion by the community sifts out the possible errors and gives to the residual facts which are generally accepted by the locality *374 a. trustworthiness which allows these facts to be presented as evidence in a court of law.
Tract H-2 was conveyed to Hoskins on January 23, 1865, by James Grider. It was said to lie on Indian Creek and to contain 400 acres. Gibson, the county surveyor, had made a survey of this tract for the granddaughter of Grider, who had acquired it from him by inheritance, either directly or indirectly. He testified it had always been known as the James Grider farm and was the same land the mineral rights in which were conveyed from Grider to Hoskins. This testimony was corroborated by L. A. Connor, 73 years of age, who owned the adjoining farm.
Tract H-3 was acquired by Hoskins from Jacob Grider. It also lay on Indian Creek in Clinton County and was said to contain 460 acres more or less. Gibson had also surveyed this land and was thoroughly familiar with it, having retained his surveyor’s notes. He said the lands were known in the community as the Jacob Grider farm. He said it was the same lands as those described in the deed from Jacob Grider to Hoskins. Jacob Grider was not known to own any land in this locality other than that described in the deed to Hoskins.
This testimony was supported by a patent from the State to Grider for 160 acres, dated September 12, 1856, and another for 90 acres, dated August 23,1849.
There is also an index reference in Cumberland County, out of which Clinton County was carved, to a deed from John Davis to Grider on September 17, 1822, for 79 acres, and there is a patent from the State to Davis for 79 acres. This acreage lies between the two tracts patented to Grider.
It would seem that the evidence is sufficient to establish ownership in Jacob Grider to these three tracts totalling 329 acres.
Tract H-8 was acquired by Hoskins from Solomon Jordan Hunter, Sr. It also lay on Indian Creek in Clinton County, and was said to contain 700 acres, more or less; but Gibson, the county surveyor, said 225 acres of it lay outside of the lands taken by defendant. Apparently, Hunter had also disposed of 220 acres before his deed to Hoskins. Gibson *375 testified this was the only land Hunter was known to have owned in this locality.
His testimony was supported by R. L. Dickerson, an adjoining land owner who testified that Hunter was reputed to own the tract in question.
There is no documentary evidence to support the testimony of these witnesses except a patent to Hunter for 50 acres, dated November 5,1847.
The evidence to support ownership of this tract is weak, but, with some misgivings, we hold plaintiffs may recover for 358 acres in this tract.
Tract H-9 was acquired by Hoskins from John Mogg by deed recorded January 28, 1865. Mogg’s deed recited that the lands lay on Indian Creek and contained 605 acres, and had been acquired by him from O. H. ,P. Snow. This deed was also destroyed, but there was introduced in evidence a certified copy of a deed from Snow to Mogg for 498 acres lying on Indian Creek. This deed was recorded after the courthouse fire and after the deed of the mineral interests from Mogg to Hoskins. Gibson, the county surveyor, testified that the land, the mineral interest in which Mogg transferred to Hoskins, was the only land Mogg was ever known to have owned on Indian Creek in Clinton County. Mogg’s grandson, Richard Mogg, testified that he had lived with his grandfather and was thoroughly familiar with his grandfather’s lands, and that they were the lands described in the deed from Mogg to Hoskins.
In the light of the foregoing, we concur in the trial commissioner’s findings as to tracts H-2, H-3, and H-9, since we believe that the documentary and parol testimony was sufficient to prove their location.
The only other issue presented by the record is the question of the value of the plaintiffs’ mineral interest. The testimony of plaintiffs’ expert is in complete disagreement with that of the defendant’s. The plaintiffs claim a value of $150 per acre, while the defendant says the value of the interest was only $1.00 an acre at the time of the taking. In 1948, two or three years before the taking, a Mr. Krebs made an appraisal of plaintiffs’ interest prior to the inundation of the property and he placed a speculative value of *376 $3.50 an acre on the plaintiffs’ interest. There is evidence to the effect that this value decreased prior to the taking, but it also appears that this decrease was due, in part at least, to the knowledge in the community of the defendant’s project. The figure of $3.50 an acre appears to be the most competent estimate of the value of the interest taken, and we adopt that amount as the value of plaintiffs’ interest at the time of the taking.
It is found as a matter of law that plaintiffs are entitled to recover for the taking of their mineral rights in 2,350 acres of land, which had a total value of $8,225 at the time of the taking. Judgment will be entered in this amount, plus interest computed at four (4) percent per annum on said amount from December 1, 1950, to date of payment as compensation for the delay in payment.
It is so ordered.
Faiiy, Circuit Judge, sitting by designation; Littleton, Judge {Bet.) ; Labamore, Judge, and Jones, Chief Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the briefs and argument of counsel, and the report of Trial Commissioner Marion T. Bennett, makes the following findings of fact :
1. This is an action for the recovery of just compensation for the mineral rights allegedly owned by plaintiffs in 2875.24 acres of land taken by the defendant within the confines of Wolf Creek Reservoir on the Cumberland River in Russell and Clinton Counties, Kentucky. Most of this land now lies below the surface of Lake Cumberland in Clinton County, Kentucky. Defendant’s answer admits that, by reason of construction of the dam, minerals cannot be removed from the lands within the project boundaries but denies that plaintiffs have title to those minerals if any.
2. The Wolf Creek Dam was authorized by the Flood Control Act approved June 28, 1938 (52 Stat. 1215), and approved for construction by the Rivers and Harbors Act of July 24, 1946 (60 Stat. 634, 636). The gates of the dam were closed on or about December 1, 1950, and the water *377 rose to cover most of the land in the project by the' spring of 1951. .
3. The land which contains'the mineral rights in issue was owned prior to 1865 by 11 different persons. These people conveyed their rights, to W. A. Hoskins, a resident of Garrard County, Kentucky, in 1864 and 1865. A certified copy of each of the 11 deeds to Hoskins is in evidence. It is agreed that plaintiffs acquired whatever interest Hoskins held. In general, the location of the property conveyed in the deeds to Hoskins depended solely on -references to previous deeds of record for. a complete description of the property. Most of the previous deeds were destroyed in 1864 when the Clinton County courthouse burned.- ' 4. Defendant did not purchase the mineral rights now in issue because the title company advised defendant that, “conveyance of these mineral rights to the present claimants and their ancestors in title does not describe the land under which the minerals are located sufficiently to identify the land.”
5. At the trial of this case plaintiffs sought to prove the location of the 11 tracts of land containing the minerals purchased by Hoskins. Plaintiffs have sought to do this as an exception to the rule against hearsay. They have introduced the evidence of William H. Gibson, 74 years of age, a resident of Albany, Kentucky, the county seat of Clinton County. Mr. Gibson has been the official county surveyor of Clinton County for approximately 38 years. In this capacity he had a familiarity with many old boundary lines and knew of the reputation of such lines and of ownerships of land. He had worked for the Corps of Engineers for a few months in 1942 and 1943, making preliminary surveys and attempting to establish ancient boundary lines within the reservoir area. He did this by searching old records, contacting elderly residents of the area and by using his surveyor’s notes made and collected over a period of many years. He also went upon some of the property here in issue in an attempt to relocate some of the original survey lines. Some of the original patents referred to in the deeds to Hoskins were also found by Gibson.
*378 Mr. Gibson prepared a map to illustrate bis testimony and it is in evidence as plaintiffs’ exhibit 7. On the basis of his investigation, Gibson located several tracts of land identified as tracts H-l through H-14 and so marked on his map. In his opinion, those tracts identified as tracts H-l through H-ll represented the lands referred to in the 1865 deeds to Hoskins in which plaintiffs claim ownership of the mineral interests’. The defendant used tract numbers prefaced by letters of the alphabet which refer to different pages of a series of maps used by defendant in portraying surface ownership. The tracts designated “A” appear on plaintiffs’ exhibit 3, those designated “B” are on plaintiffs’ exhibit 4, those designated “C” are on plaintiffs’ exhibit 5, and tracts designated “E” appear on plaintiffs’ exhibit 6. Plaintiffs’ exhibit 7 carries a cross-index between the tract numbers used by plaintiffs and defendant.
Plaintiffs’ exhibits 3, 4 and 5 are official copies of the segment maps prepared by defendant in the planning and construction of the Wolf Creek Dam and Reservoir project, are drawn to scale and show the project taking lines. Plaintiffs have plotted the descriptions given in the patents or surveys to the same scale to show similarity of the ancient boundaries to those shown on the segment maps to support the reputation testimony.
Plaintiffs also offered the testimony of Howell Pritchard, a lawyer of Albany, Kentucky, who had been employed by defendant from June 1941 to September 1943 and again from October 1947 until September 1948 with respect to the acquisition of the land for the project. He served as attorney for the project and later as project manager for acquisition of the land. In the course of Pritchard’s practice of law he has examined titles for the Title Guarantee and Trust Company of Chattanooga concerning land in Clinton County. He was employed by defendant to examine the title to plaintiffs’ mineral interests for the purposes of this case and was subpoenaed by both parties. The evidence offered by Gibson and Pritchard will be considered in connection with the findings of fact on each tract which will now be treated in numerical order.
*379 THE TITLES
6. Plaintiffs’ tract H-l represents land allegedly owned by Josb.ua Grider in 1865. The deed of mineral rights to Hoskins from Joshua Grider, dated “-day of January 1865,” describes the land as follows:[1]
* * * on the tracts of land now' owned by the said Joshua Grider said tracts of land is lying being and situated in the County of Russell and State of Kentucky on the waters of Cumberland River on Guffey and Indian Creeks was conveyed to said Grider by James Pierce and 50 acres by James Piercey deeds of record in the Russell County Court and by patent from the Commonwealth of Ky said deed and patent referred to for a full and complete description of said land containing in the aggregate 250 acres. * * *
Mr. Gibson stated that the land described in the above deed was actually four separate tracts. They are not adjoining tracts and are on different water courses as indicated in the deed. Gibson’s testimony was that the land was Joshua Grider’s. Grider obtained a patent to 100 acres on Indian Creek on February 2, 1853, and this was recorded in Russell County. Mineral rights in this tract were conveyed to Hoskins. Grider had another 50 acres surveyed on May 1,1819. There is no patent of this tract in evidence or shown to have been issued or recorded.
Gibson also located in the Russell County surveyor’s book surveys of James Piercey for 50 acres and Tom Davis for 50 acres, which plaintiffs claim are the tracts mentioned in the deed to Hoskins. There is no record of any deeds or patents to these people or conveyance to Grider of titles to the tracts surveyed for Piercey and Davis or of one from James Pierce, the latter assumed by plaintiffs to be the Davis land. There is no credible evidence that the Piercey and Davis tracts are those referred to in Grider’s deed to Hoskins.
It is found that plaintiffs are entitled to recover the value of the mineral rights in the 100 acres for which Grider re *380 ceived a patent, which it is found has been identified and located by the weight of the evidence.
7. Plaintiffs’ tract H-2 represents land claimed to have been owned by James Grider in 1865 and by deed dated January 23, 1865, the mineral rights therein were conveyed to Hoskins. The land is described as follows:
* * * a certain tract or parcel of land lying and being situated in the County of Russell'and on Indian Creek and its tributaries the land being the same on which I now live and contains four hundred acres and conveyed to me by deed from Shadrick Hunter bearing date Eighteen hundred and Thirty Seven the same bemg on record in the County Court Clerks office of Russell County, Kentucky and to which deed reference is hereby made for more particular description. * * *
The Hunter deed referred to above is in evidence but for description refers to patents secured by others, which patents are not in evidence and the description quoted, therefore, is not helpful in locating the land.
8. Mr. Gibson identified the land on the basis of his knowledge of the area and a survey he made 20 years ago for Annie Jorris, granddaughter of Grider. She transferred the land to defendant. Gibson said that the farm had been in one tract for as long as he had knowledge, that it had always been known in the community as the James Grider farm and that it was the same land which contained the minerals sold by James Grider to Hoskins. L. A. Conner, a 73-year-old resident of Clinton County, testified that he had a farm joining the James Grider tract on the south side, that he was familiar with the Grider property, had worked on it, and that it was known as the James Grider farm and the only land in the area ever so known. He did not know how many acres were in it. As a matter of law, the evidence is found sufficiently credible to identify as a fact the location of the James Grider property as that to which Grider deeded mineral rights to Hoskins, the same being owned by plaintiffs when taken by defendant.
9. Tract H-3 is the subject of a deed dated January 25, 1865, under which Jacob Grider conveyed mineral interests under certain Kentucky lands to Hoskins. The land was described in the deed as follows:
*381 * * * said tracts of land lying and being situated in the county of Clinton and State aforesaid and on the waters of the west fork of Indian Creek and its trib-utories, the land being the same conveyed to the said Grider by several parties and of record in the Clerk’s office of Clinton and Cumberland County Court the deeds is referred to for a full description of the same. * * * Said lands are all adjoining and compose all the land owned by Jacob Grider on Indian Creek and its tributories in Clinton County and contain in the aggregate four hundred and sixty acres more or less. * * *
Clinton County was carved out of Cumberland County in 1836 and conveyances of land in Clinton County prior to that date are recorded in Cumberland County. This will explain the reference to that county above and other references subsequently made throughout the findings.
10. Tract H-3 was identified by Mr. Gibson as the land containing the minerals conveyed by Grider to Hoskins and he stated that he was thoroughly familiar with the land, having surveyed every tract of it and having surveyor’s notes he had made at the time and information about the location of the land from the surveyor’s books of Clinton and Cumberland Counties. He stated, further, that the tract was known as the Jacob Grider farm in the community and he marked it on maps in evidence.
11. In order to identify further the location of tract H-3, the Jacob Grider farm, plaintiffs introduced certified copies of certain patents. One patent from the State to Grider, dated September 12, 1856, was for 160 acres and another for 90 acres was dated August 23, 1849. The index records of Cumberland County refer to a conveyance from John Davis to Grider on September 17, 1822, but the deed has been lost and the description of the land is unknown unless it be assumed that it is the same 79 acres patented by Davis on January 26, 1816. Plaintiffs’ witness Gibson makes this assumption because the 79 acres is on the west fork of Indian Creek and is located between the two tracts patented by Grider. It is found that the assumption is reasonable. Pritchard said the land was owned by Grider in 1865 but would, not “hazard a guess” as to whether it was the same land as described in the deed to Hoskins. There is no evi *382 dence, however, that Grider had any other land that could be said to resemble the description in his deed to Hoskins. Further, the calls in the patents when compared to the boundaries of the tracts taken by the defendant are so similar as to leave no reasonable doubt about their location. These three tracts total 329 acres. The balance of the 460 acres referred to in the deed to Hoskins is not established as to location or ownership. As a matter of law, plaintiffs are entitled to recover the value of the mineral rights in 329 acres.
12. The minerals in tract H-4 were conveyed by John Bal-lew of Clinton County, Kentucky, to W. A. Hoskins on January 25, 1865, the deed describing the land as:
* * * the tract of land now owned by the said John Ballew, said tract of land is lying being and situated in the County of Clinton and State of Kentucky and was conveyed to the said John Ballew by the Commonwealth of Kentucky and of record in the Register office Book 48 page 163 No 27 158 and the Deed is referred to for a full and complete description of said land * * *
13. There is in evidence a certified copy of the patent, No. 27158, dated September 11, 1856, whereby John Ballew took title to 270 acres of land on the west fork of Indian Creek, Clinton County, Kentucky. Mr. Gibson' adequately identified the tract patented as the one described in the deed to Hoskins. Pritchard’s evidence was that the John Ballew land was part of the tract, B-218S, conveyed to the defendant by Willie Marsh Ryan.
It is found that plaintiffs have good title to the mineral rights in 270 acres of the land patented by John Ballew who transferred these rights to Hoskins.
14. By deed dated January 26,1865, William Neathery conveyed the mineral rights under tract H-5 to Hoskins and the land was described as follows:
* * * said tract of land lying and being situated in the County of Clinton on the waters of Indian Creek and its tributories. The above named tract of land was conveyed to said William Neathery by_ by deed of record in the County Court Clerk’s office of Kentucky and the said Deed is referred to for a full and complete description of the same * * *
*383 15. In 1850 James Neathery of Clinton County sold William Neathery 71 acres on the west fork of Indian Creek. The deed was recorded but destroyed when the courthouse burned. In November 1868 James Neathery reconveyed the land to William Neathery with a new deed which was recorded reciting that it was done to reinvest William with title. A copy of the deed is in evidence.
16. Since no deed to Neathery, other than the one above, has been identified or found, plaintiffs sought further to identify and describe the land by two patents to William Neathery. One patent, dated September 12, 1856, was for 76 acres and the other, dated June 13,1857, was for 90 acres. Both patents describe the land as on the west fork of Indian Creek.
17. Gibson said that the land owned by William Neathery in 1865 was made up of the three parcels mentioned above and he drew the tract on a map in evidence. The basis of Gibson’s opinion was that the tract was known in the community as the William Neathery tract and he was not known to own any other on the west fork of Indian Creek. Further, the land was located by Gibson by reference to the descriptions given in the patents and by the deed in evidence. The deposition of J. B. Neathery, William’s son, is also relied on by plaintiffs. Plaintiffs’ witness, Pritchard, could not locate the land but agreed that the patents and deed showed that William Neathery owned 236 (the correct total is 237) acres in 1865 on the west fork of Indian Creek.
18. It is found that in 1865 William Neathery owned the lands described by the two patents and deed identified above and as located by Gibson. The deed to Hoskins, however, does not refer to any lands patented by Neathery but only to a tract conveyed to him by deed. The only such deed referred to by the evidence is the one from James Neathery for 71 acres. It is found that plaintiffs’ right to recover the value of mineral interests in tract H-5, the William Neathery rights deeded to Hoskins, is limited to the value of such rights in 71 acres.
19. Plaintiffs’ tract H-6 purports to represent the land owned by James Neathery in 1865. A deed in evidence *384 dated January 26, 1865, purports to convey the mineral rights to W. A. Hoskins and describes the land as follows:
* * * the tracts of land now owned by the said James Neathery said tracts of land are lying and being and situated in the County of Clinton and State of Kentucky on the waters of Indian Creek and was conveyed to said James Neathery by deed of record in the Clerk’s office of Cumberland County and Clinton County said deed is referred to for a full and complete description of the same. * * *
20. The patent or patents to James Neathery are not in evidence and the deeds referred to in the conveyance above were destroyed. Plaintiffs sought to prove the location of the land by the testimony of Mr. Gibson as to its reputation in the community. Gibson had talked to Tom Davis, who was dead at the time of the trial. Davis was a son-in-law of James Neathery, the grantor to Hoskins. Davis had a reputation for knowing ancient land boundaries in the area. Gibson had, also, surveyed part of the alleged James Neath-ery tract at one time. Plaintiffs rely also on the deposition of J. B. Neathery, grandson of James Neathery. J. B. Neathery was about 1 year old when his grandfather died. He was familiar with the farm, however, having lived and worked on it and undertook to describe its location. He said it was on the west fork of Indian Creek and made a reference to neighbors’ lands. He was uncertain about the size of the farm, thinking it between 120 and 200 acres. He did not have, evidence of the source of his grandfather’s ownership of the land. Gibson identified and located on plaintiffs’ exhibits 4 and 7 where he thought the land was located. He knew of no reputation that J ames Neathery owned any other land in the area.
21. Plaintiffs’ witness, Pritchard, undertook to trace the chain of title. Tract H-6 is actually made up of four tracts designated on plaintiffs’ exhibit 4, a map in evidence, as B-208S, B-209S, B-219S and B-221S. Plaintiffs claim only a portion of B-208S south of Indian Creek. It contains approximately 78 acres out of a total of 138. Pritchard said the mineral interests were sold in only 50 acres of the total and he could not identify what 50 acres. Pritchard *385 was also unable to say whether the 78 acres claimed by plaintiffs were north or south of the creek.
With respect to the other three tracts, Pritchard said he could trace them back to James Neathery but that the records indicated he did not get title to them until 1868 whereas it is alleged the mineral rights were transferred to Hoskins in 1865. He did agree with Gibson’s location of these three tracts. Plaintiffs say that this problem about dates is refuted by the deposition of J. B. Neathery and the circumstance that, since J ames Neathery perfected William’s title to a tract, as noted above, by reconveying it to him in 1868 after the courthouse records were destroyed, it must be assumed that he would have taken the precaution to protect his own title by getting new deeds which he recorded in 1868. Upon this assumption they predicate the claim that under the principle of after-acquired title the plaintiffs got the mineral rights.
22. It is found that plaintiffs’ evidence and assumptions are inadequate to identify, describe and locate the land of tract H-6 in which mineral rights were conveyed by James Neathery to Hoskins in 1865.
23. Tract H-7 represents land referred to in a deed recorded on May 25, 1865, in Clinton County, Kentucky, wherein John Dicken purported to convey to Hoskins the mineral interest under property described as:
* * * tract of land I now own conveyed to me by Samuel Snow containing Fifty Acres more or less lying on Indian Creek Clinton County Kentucky adjoining the lands of C. M. Conner and others * * *
Gibson testified that this was part of a larger tract of over 200 acres but he could not identify what part it was. It is found that tract H-7 has not been identified as the tract referred to in the deed to Hoskins.
24. Tract H-8 represents land referred to in a deed recorded in Clinton County on January 27, 1865, wherein Solomon Jordan Hunter, Sr., conveyed minerals in land described as:
* * * in or on the tracts of land now owned by the said Solomon Jordan Hunter. Said tracts of land are lying being and situated in Clinton County Kentucky on the waters of Indian Creek and tributories and was *386 conveyed to said Hunter by William Hunter, Peter Hunter, Elisha Welcher and others by Deed of record in the Clerks office of the Clinton County Court which is referred to for a description of the same containing in the aggregate Seven Hundred Acres more or less. * * *
Mr. Gibson identified the land mentioned in the deed as the only land Mr. Hunter had the reputation of owning on Indian Creek and its tributaries, that he had surveyed part of it and he marked its location on exhibits in evidence. He said 225 acres of the 700 acres were outside of the taking line.
25. Gibson sought further to establish the location of the land by reference to a patent dated November 5, 1847, to Solomon Jordan Hunter for 50 acres. He also referred to a patent dated in 1825 to William Hunter for 225 acres which, it is agreed, lie outside of the taking line of the reservoir. The William Hunter patent is relied on by Gibson to help fix the location of 50 acres patented in 1847 to Elisha Wilcher. The latter two patents described adjacent land. No deeds are known to exist showing any transfer to Solomon Jordan Hunter of the lands patented by William Hunter and Elisha Wilcher, they presumably having been burned in the courthouse. The Elisha Wilcher tract lies within the area described by Gibson as having the reputation of being the Solomon Hunter land and Elisha Wilcher is mentioned in the deed to Hoskins. Upon this circumstantial evidence, plaintiffs predicate their claim that Wilcher deeded his land to Solomon Hunter sometime prior to 1865.
26. Tract H-8 is made up of several tracts identified by defendant on maps in evidence. Mr. Pritchard ran the title on tracts C-320S and C-323S back to 1882, in which year Sutton Hunter willed title therein to Lula M. Evans. Plaintiffs assume that Sutton Hunter had good title because there is no evidence that he patented the land; Solomon Hunter said he owned it in 1865 and that in that year he claimed ownership of 700 acres, but when he died in 1886 he owned 480 acres, which means he must have sold 220 acres after 1865 and that must be the approximately 220 acres Sutton Hunter had when he died. There is no evi *387 dence of any relationship between Solomon and Sutton Hunter or evidence of any deed to the land having been recorded by Sutton Hunter. E. L. Dickerson, a witness who in 1925 conveyed tract C-313 to defendant, which he had purchased in 1922, testified that Solomon Hunter had the reputation of owning the tracts along Laurel Branch which would have been tracts C-320 and C-323.
As to the Dickerson tract, C-313S, he testified that he had the land surveyed in 1925 when one of the “Hunter boys” was alive and told him about its proper location. Pritchard traced the title in 145 acres of the Dickerson land back to Solomon Jordan Hunter. He said there was more but it was not possible to identify or locate it from the description.
The evidence about the other tracts in H-8 is that C-314S, an area of 22 acres, was heired by a descendant of Solomon Jordan Hunter, Nettie McWhorter. Tracts of 108 acres, conveyed to defendant by Alvin S. Cook (C-316S and C-318S), are involved in several chains of title, only 67 acres of which are traceable to Solomon Jordan Hunter. Tract C-301S was deeded to defendant by C. Merle Conner. This was 24 acres of land formerly owned by Solomon Jordan Hunter which came down to his heirs. There is no evidence on any remaining parcels which constitute tract H-8.
27. The evidence establishes and it is found that Solomon Jordan Hunter had good title to 358 acres in which he deeded mineral rights to Hoskins. As a matter of law, plaintiffs are entitled to recover for the value of mineral rights in 358 acres in tract H-8.
28. Tract H-9 represents land referred to in a deed recorded January 28, 1865, from John Mogg to W. A. Hoskins conveying the mineral interests therein. The land is described in the deed as follows:
* * * two certain tracts or parcels of land lying and being situation in the County of Clinton and State of Kentucky on Indian Creek and its tributories the same being the land on which I now live containing Six Hundred and Five Acres and conveyed from O. H. P. Snow to said John Mogg by deed bearing date _and to which reference is made for *388 more particular description containing Six Hundred and Five Acres in the Aggregate. * * *
29. A certified copy of a deed from Snow to Mogg, dated April 1, 1857, is in evidence. This deed, for reasons not explained, was recorded after the courthouse fire. It was recorded in deed book B at page 361 whereas the mineral deed from Mogg to Hoskins was recorded in deed book A at page 73. The deed from Snow describes nine tracts which total 498 acres. The descriptions in the deed from Snow are not adequate standing alone to identify or locate the land. Gibson, however, identified the’land as being that described in the deed to Hoskins on the basis of his personal knowledge derived from the reputation of the matter in the area. He marked the tract H-9 on exhibits in evidence. Gibson said this was the only land John Mogg was known ever to own in Clinton County on the waters of Indian Creek. Richard Mogg, grandson of John Mogg, testified that his grandfather died at the age of 109 years, that he had lived with his grandfather and identified the John Mogg farm as to location and in other respects corroborated the evidence given by Gibson. Pritchard corroborated this evidence in part by tracing the chains of title to the extent that this was possible.
30. It is found that 498 acres of the tract, H-9, the subject of a deed from John Mogg to W. A. Hoskins, have been adequately identified and located by the weight of the evidence.
31. Tract H-10 represents land referred to in a deed from James M. Kelsey to W. A. Hoskins, recorded on January 26, 1865, conveying the mineral rights in land owned by Kelsey and described in the deed as:
* * * a certain tract or parcel of land containing Two hundred and Seventy four and one fourth Acre. Two Hundred Acres of which being the same purchased by said James M. Kelsay of Elisha Wilcher of the County of Wayne and State of Kentucky to which Deed reference made for further description it being the same land upon which the said James M. Kelsay now lives in the County of Clinton and State of Kentucky on the Pitman Fork of Indian Creek also Seventy Four Acres granted by the Commonwealth of Kentucky to said *389 James M. Kelsay by patent bearing date 30th. day of May 1856 to which reference is made for further description. * * *
32. There is in evidence a patent dated May 4, 1855, for 74 acres to James Kelsey and a patent dated June 13,1851, for 200 acres issued to Elisha Wilcher. Gibson by reputation identified the tracts shown in these patents as the same as in the deed from Kelsey to Hoskins. Pritchard confirmed this evidence by his testimony regarding the record title except that there was no evidence of a deed from Wilcher to Kelsey for the 200 acres. It is noted that when Kelsey sold the 74 acres he had patented to O. H. P. Snow he excepted the minerals he had conveyed to Hoskins and that when Chas. Wright, who had bought 200 acres from Kelsey, conveyed the same to Hudson the mineral rights were again reserved.
33. It is found that the 274 acres in the deed from Kelsey to Hoskins are adequately identified and located by the weight of the evidence.
34. Tract H-ll represents land referred to in a deed between Andrew A. Brown and W. A. Hoskins recorded on January 26, 1865, and in which Brown conveyed his mineral rights in the land to Hoskins. The land was described in the deed as :
* * * the tract of land now owned by the said A. A. Brown. Said tract lying and being situated in the County of Clinton and State of Kentucky on the waters of Indian Creek a tributary of Cumberland River and was conveyed to the said Brown by the Commonwealth of Kentucky by patent bearing date _ day _18_and contains Fifty Acres Said Patent is referred to for a full and complete description of said land. * * *
35. There is in evidence a patent issued by Kentucky to Brown, dated May 4, 1855, for 50 acres in Clinton County on the waters of Indian Creek. Gibson located this patent on the maps in evidence. Gibson had. surveyed this land.
36. The 50 acres referred to in the deed from Brown to Hoskins has been identified and located by the weight of the evidence.
*390 37. Plaintiffs introduced no evidence relative to tracts H-12, H-13 and H-14, appearing on plaintiffs’ exhibit 7 in evidence.
38. In Kentucky, mineral estates are subject to assessment for taxes, as in the case of all real estate or personal property. The plaintiffs’ mineral estates have never been assessed for taxes nor have any taxes ever been paid on them so far as the records show.
39. In summary, plaintiffs are entitled to recover the value of the mineral rights in 2,350 acres, as follows:
Find- Iden-ing tified Claimed No. Tract Grantor to Hoskins (acres)
6-7 H-l Joshua Grider_ 100 250
8-9 H-2 James Grider_ 400 400
10-12 H-3 Jacob Grider_ 329 460
13-14 H-4 John Ballew_ 270 270
15-19 H-5 Wm. Neathery_ 71 239
20-23 H-6 James Neathery_ 0 78
24 H-7 John Dieken_ 0 50
25-28 H-8 Solomon Jordan Hunter_ 358 475
29-31 H-9 John Mogg_ 498 605
32-34 H-10 James M. Kelsey_ 274 274
35-37 H-ll Andrew A. Brown_ 50 50
2, 350 [2] 3, 148
GEOLOGY AND VALUATION
40.Between 1,250 and 1,500 oil wells have been drilled in Clinton County, both productive and nonproductive. Approximately 2,000,000 barrels were produced between 1936 and 1950. Between 1946 and 1951 the average annual production was 297,064 barrels. Official production figures for the years 1946-1951 are:

Barrels

1946 - 446,158
1947 - 395,488
1948 - 413,286
1949 - 252,030
1950 -^-155,016
1951 - 102,407
*391 Oil was discovered in the area of Indian Creek as early as 1904. By 1917 there was production in adjoining Bussell County to the north and across.the line into Clinton County in its northwestern portion. Some of these wells produced gas. There is no commercial market for the gas. Clinton County is not considered an important oil production area as compared to some other areas of Kentucky.
41. There are two geologic structures from which oil has been produced in Clinton County. These structures are known as the Granville Strip and the Stones Biver formations. The Granville Strip forms a reef running from the southwest to the northeast through the western side of Clinton County and the western extremity of plaintiffs’ holdings. It is approximately 16 to 22 miles long and 1*4» to 2 miles wide. The oil-bearing sands are shallow, producing at depths from 300 to 650 feet. Most of the oil wells have been found in the lower part of this strip. The nearest wells with any oil to plaintiffs’ holdings are a quarter of a mile away. They were drilled in 1946 and have always been small producers. There were five originally but only three now. Their gross production in 1957 was $740.
No oil has been found on plaintiffs’ property with one exception. This well was abandoned because of confusion over ownership of the mineral rights as between plaintiffs and the lessor. It is found that while the production of oil on plaintiffs’ holdings in the Granville Strip may have been possible, but for the title question and flooding, there is no assurance that it would be economically or commercially feasible. At best, production from the Granville Strip is not sustained, starting out as high as 90 barrels per day and dropping off in a year to a barrel or less per day, which is not profitable. Some wells in this strip are still producing, however. Most successful wells in either the Granville or Stones Biver structures are several miles away from plaintiffs’ holdings.
42. Approximately three-fourths of plaintiffs’ holdings are east of the Granville Strip and if there is oil under them it is largely in fractures in the Stones Biver formation or deeper. This formation is 600 to 800 feet below the Granville Strip. Oil has been found in the Stones Biver structure *392 in Clinton County at around 1,400 feet and at 10 other levels. Such oil wells have had a short life, as little as 39 days, although initially producing as much as 1,000 barrels per day. The Patrick Dome has been a producing area in the Stones River structure although located in the Granville Strip to the west of plaintiffs^ holdings from y2 to 2 miles away. There is no way to anticipate, with any degree of certainty, whether an operator will be able to hit oil in the Stones River formation. Wells in this formation come from fractures difficult to discover. The formation is deep and impermeable.
43. Plaintiffs’ expert on valuation was Mr. Woodson Diamond of Somerset, Kentucky. Diamond is a geologist, oil and gas producer, and drilling contractor, and has made numerous surveys and leases in Clinton County, having operated actively there for over 15 years. He is the author of published articles on the subj éct.
Mr. Diamond located several of the successful pools in the Granville Strip. He drilled 125 wells in the county, most of them productive. Diamond drilled the one well put down on plaintiffs’ lands and, although oil was found, it was abandoned, as heretofore noted, because of uncertainty about title to the mineral rights. The evidence does not show how productive the well was or in what structure the oil was found. Diamond’s opinion was that there was oil and gas on the plaintiffs’ holdings as well as radioactive Chattanooga shale. He admitted that presently there was no commercial value to the gas and shale.
44. Diamond was familiar with maps in evidence showing location of oil discoveries in Clinton County. He had prepared one of them himself in 1948 but regarded plaintiffs’ exhibit 9, an official map prepared in 1950, as the most accurate. The maps show, among others, the Patrick Dome west of plaintiffs’ holdings. It produced 75*000 barrels from 25 acres. The map prepared by Diamond shows a similar dome he called the Indian Creek Dome on part of plaintiffs’ property east of the Patrick Dome but the later map does not show it. There is no evidence that oil has been discovered in the Indian Creek Dome. The contours of the two domes have a similarity on Diamond’s 1948 map. Further reference to this, however, is made in finding 48.
*393 ' 45. Diamond had paid $500 per acre for a lease which turned out to be productive for only 39 days on the south edge of the proved Patrick Dome about. 2 miles from the alleged Indian Creek Dome. It was next to a well producing 4,000 barrels daily. Diamond assumes the same oil-bearing strata in the Stones Diver formation is in both domes although there are some dry holes between them. Diamond had paid as low as $1 per acre for other leases in the Granville Strip. Based upon his extensive personal experience in the area, Diamond’s opinion was that the average price on potentially productive land in Clinton County between 1946 and 1952 would be at least $150 per acre, and that this was the value of plaintiffs’ property on the date of taking. He suggested no distinction between the average lease valuation per acre and the valuation of a fee per acre. Diamond did not identify any lease on property adjacent to or near to plaintiffs’ holdings which was made for $150 per acre at the time of the taking or at any other time.
46. One of defendant’s valuation experts was Berlen C. Moneymaker, chief geologist for the Tennessee Valley Authority. He had no experience in the location of oil pools or wells but had appraised mineral resources. Mr. Moneymaker has an international reputation in the matter of exploration of the geology for dam and steam plant sites, tunnels and work related to hydroelectric power development. He made an investigation in April 1957 of plaintiffs’ mineral rights by going over the tracts in a boat looking over oil wells in Clinton County outside of the reservoir area, and examining a geological survey or structural geology map of the county in evidence as plaintiffs’ exhibit 9. This is the official Kentucky publication produced on the basis of known drillings in 1950 and heretofore referred to. This study required 2 or more days.
47. Moneymaker was unable to place a value on plaintiffs’ mineral interests other than a “nuisance value.” He gave as his reason that to make a valuation he would have to do so upon the basis of “probabilities, possibilities, assumptions, rather than known reserves, definite production rate and the definite depletion period and the income from the investment.” This witness had been responsible for drilling hun *394 dreds of holes into the Stones River formation in other Southeastern States but had not struck oil, even though he had encountered fractures. He was not looking for oil but was trying to avoid oil-bearing fracture zones when he did so. Such fractures, however, cannot be identified from the surface. He would not say that oil could not be found in this formation in Clinton County or on plaintiffs’ property. He did, however, establish one discrepancy between Mr. Diamond’s map, plaintiffs’ exhibit 10 in evidence, and the official map, plaintiffs’ exhibit 9, which was 2 years more recent and based upon more newly discovered information. This discrepancy shows that the dome Diamond thought was the Indian Creek Dome is actually a depression. Diamond admitted that the more recent map was the more accurate and did not refute in rebuttal Moneymaker’s allegation which is largely the basis for Diamond’s valuation.
Moneymaker confirmed Diamond’s opinion that the Chattanooga shale is radioactive but without present commercial value.
48. Defendant also offered, as an expert valuation witness, Charles G. Krebs. He is an experienced and successful geologist, appraiser, consultant and owner and operator of oil and gas properties. He owns many oil wells in West Virginia and a few in Kentucky. In 1943, 1946, and 1948 he made studies of the Wolf. Creek Reservoir area for defendant and for some of his private clients. The latter include several large corporations. He appraised practically every piece of property having an oil or gas lease on it in the reservoir area.
49. Krebs made an appraisal for the defendant in January 1948 of plaintiffs’ mineral tracts. At that time Krebs placed a speculative value on plaintiffs’ interests at $3.50 per acre. Krebs based his valuation, among other things, on the productive history of the area and a general study of the area’s geology. By the time of taking Krebs said plaintiffs’ interests were worth only $1 per acre. He attributed this decline in value to a one-third • decline in production and not to the flooding.
50. As a part of his work for defendant, Krebs had to locate and cap or plug all oil and gas wells in the area to *395 be flooded so as to prevent contamination of the lake. This gave him opportunity to become thoroughly familiar with the taking area and the prices being paid for leases therein. He did not, however, know about all of the leases outside of that area in the county such as that of Mr. Diamond for $500 per acre on the south edge of the Patrick Dome property discovered to the west of plaintiffs’ holdings in 1948. Krebs, however, was himself owner of an interest in the Withams Pool near the Desda Pool. The Withams Pool is approximately one-quarter mile from the western boundary of plaintiffs’ mineral tracts. It is not known what Krebs paid for this interest or exactly what it was. These are two pools in the still producing Granville structure above the taking line.
51. Krebs was of the opinion that Clinton County was just a “promoter’s paradise.” He would not recommend that his clients invest or speculate in the area and it was pointed out that no major oil company had done so. The only refinery in the area is a small one at Somerset, Kentucky. Prices for Clinton County oil were lower than elsewhere. Krebs was of the opinion that more money had been spent than there was profit in producing oil in Clinton County. The production of oil in the county has been by local operators. Approximately four million dollars has been realized in gross income from oil produced in the county. The costs of its production are not established by the evidence except for drilling itself, which alone is inadequate to determine if there was an overall net profit.' Undoubtedly, some operators, such as Mr. Diamond, profited and other individuals did not.
52. Most of the land in Clinton County was under mineral lease from 1944 to 1950. Some of these leases were taken by informed and experienced operators like Mr. Diamond -and others by amateur speculators. Prices for such leases ran all the way from 10 cents to $500 per acre, depending on how close a lease was to known oil production. Sometimes bonus payments were even made for leases but none are shown to have been paid in the reservoir area. The leasing activity declined with the declining production and knowledge of the reservoir project. There is no evidence that *396 the prospective flooding caused the decline in production outside of the taking area.
53. There is no evidence of any sale by plaintiffs of any of their alleged mineral rights or of any leases thereof. The market value of a mineral estate is affected by the validity of the title, as well as by the size of the estate, proximity to proved production, similar sales and other factors. Two or three surface owners of plaintiffs’ mineral tracts made leases thereof but the consideration therefor is unknown, although it is known that no commercial production resulted, in part due to fears of operators about validity of title. Had it not been for this question about title it is found that plaintiffs before the flooding could have leased their mineral rights, for some speculators were taking leases on any place they could find when such activity was at its height.
54. Diamond’s valuation of plaintiffs’ rights at $150 per acre is found to be too high. There is no evidence of such prices paid for a lease at or near the time of taking. Such a price is an estimated average and entirely speculative and dependent as to plaintiffs’ property upon the assumption that there is oil under the part of plaintiffs’ holdings covered by the Granville Strip and that Stones Eiver production is available from the rest largely because a so-called Indian Creek Dome is assumed to exist. Plaintiffs have thought they had good title but have not produced oil in commercial quantities on their property. There has been no appreciable production adjacent to their property. Plaintiffs’ claim for $150 per acre for 2875.24 acres, or $431,286, is found to be excessive and not supported by the evidence.
55. Defendant’s estimate of a nuisance value of $1 per acre is found to be too low. Plaintiffs presently are lessors of two tracts in the county outside the taking line for which they receive $1 per acre per year on 1-year leases for 858 acres. It is found that plaintiffs, but for the flooding and uncertainty of title, could have leased their mineral rights.
Krebs, in 1948, had placed a speculative value of $3.50 per acre on plaintiffs’ property although he- thought the chances of finding oil there, sufficient to be profitable, were *397 quite remote. As shown in finding 49, he thought that due to a decline in production, and interest in the area, of at least one-third, plaintiffs’ interests were worth only $1 per acre at the time of taking. The decline in production outside of the taking area was not due to flooding although the decline in interest in the plaintiffs’ property could have been. Had it not been for the flooding, and since plaintiffs’ property was about the only land left in the county not under mineral lease, it is found reasonable to assume that it would have had a value as high as it did in 1948. This, of course, would have been contingent on availability of clear title which had previously prevented it from participating in the flurry of leasing activity and thus having any market value. It is found, as a matter of law, that plaintiffs have ascertainable title to 2,350 aeres, and the fee in the mineral rights had a value of $3.50 at the time of taking, or a total value of $8,225.
CONCLUSION OR LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiffs are entitled to recover, and it is therefore adjudged and ordered that they recover of and from the United States eight thousand two hundred twenty-five dollars ($8,225), .plus four (4) percent per annum on this amount from December 1, 1950, to date of payment as compensation for the delay in payment.

 The quotations taken from the deeds set forth in this and following findings are quoted verbatim, no effort being made to correct the grammar or to Interpolate for fear of inadvertently altering the description.

 This figure represents the total acreage mentioned- in the deeds to Hoskins as modified by plaintiffs* evidence. It Is further modified, however, by agreement between the parties that 2875.24 acres of land represent the total in the taking area, in which plaintiffs claim mineral rights.